Estate of Shea: Shea, Appellant, vs. Shea, Administratrix, Respondent.

*April 3—April 30, 1929.*

For the appellant there was a brief by *Platt Whitman* of Highland and *Kopp & Brunckhorst* of Platteville, and oral argument by *L. A. Brunckhorst*.

For the respondent there was a brief by *Hill, Thomann & Beckwith* of Madison, and oral argument by *A. J. Thomann*.

CROWNHART, J. The claimant was one of eight children of Pierce Shea and his wife. After the death of her father in 1892, it is evident that her one-eighth interest in her father's farm was sold to the deceased, John Shea. A portion of the record of the deed, from the records of the register of deeds, was read into the evidence, by which it appeared that the claimant and three sisters conveyed an undivided four eighths in certain lands to the deceased, John Shea, in consideration of $3,200, the receipt of which, in hand paid, was duly acknowledged. The deed was dated April 15, 1892, and the claim here filed is dated as of March 1, 1892. The contention of the claimant is that she was not in fact paid any consideration for this deed, and that at the date thereof the deceased, John Shea, became indebted to her in the sum of $800 for her one-eighth interest in the property, which, with interest at six per cent., amounted to the sum claimed at the time of filing her claim.

The evidence that the deceased, John Shea, was indebted to the claimant consists of certain admissions by way of conversations John Shea had with various parties during his lifetime, and particularly a conversation that John Shea had

with the claimant about August 1, 1926, at which time he gave the claimant $7. There is no dispute about the fact that John Shea turned over to the claimant at or about that time $7 in cash. The contention on the part of the claimant is that the $7 was to apply on a debt owing from John Shea to her, while the contention of the administratrix is that the money was a gift from John to the claimant.

James Shea, an adopted brother of the claimant, who lived with her and her brother William, testified that he heard a conversation between the claimant and the decedent in August, 1926, in William Shea's house. The claimant "said she was going out West to see her sister. John said, 'Ellen, have you enough money?' Ellen said she had some, she didn't know whether it was enough or not. John said, 'I haven't much but I will give you some.' John took out his pocketbook and gave her $7, and told her that he would have to get it squared up what he owed her. He would give her a note. He said, 'When you come back I will square it up.' She said, 'All right, John, we will apply this on it.' "

James Shea further testified that there was no one else present except himself, the claimant, and the decedent. William Shea was "in Cobb or off somewheres else." He further testified that the last thing said by the claimant was "if he would give her a note for what he owed her she would apply the seven dollars on it. He asked her if she had money when she was going West and he gave her seven dollars, and she said if he could give her a note she would apply the seven dollars on it."

William Shea testified that he was eighty-six years of age; that he overheard a conversation between his brother, John, and his sister, Ellen, in August, 1926. He was lying on a cot in an adjoining room. His sister was getting ready to go West. He said:

"John came over to see her before she would go and he asked her if she had money enough. She said, 'I haven't

any too much.' He said, 'Well, I haven't much to give to you;' he says, 'I will give you $7.' He pulled it out and gave it to her. I was there in the next room, the door was open. I didn't want to go and listen, I didn't go and listen; that was about all I heard.

"*Q.* Was anything said by either of them with reference to the payment? *A.* Yes. 'When you come back I am going to try and have a sale and sell off and settle up my accounts,' he said.

"*Q.* What did your sister say in response to that? *A.* She said, 'That will do. I will give you credit for the seven dollars.' "

This evidently was the same conversation testified to by James Shea.

The question of law raised by the evidence is whether or not, assuming a debt to have been incurred thirty-four years before, did this transaction, when John gave to the claimant $7, constitute a payment on the identical debt that would toll the statute of limitations?

The trial court found against the claim. He heard and saw the witnesses and was in a better position to determine what credit to give their testimony. After hearing the evidence on this question, the trial court came to the conclusion that the $7 turned over to claimant in August, 1926, "seemed to be more like a gift than a payment."

In the conversation of August, 1926, there was no identification of any particular debt, if any. There were only two witnesses who testified to this conversation, and James Shea, one of the witnesses, testified that the other, William Shea, was not at home and not present at the time. Neither witness testified to any particular debt or the amount thereof. James Shea testified that the deceased said to claimant: "When you come back I will square it up," and said he would give her a note, which evidently referred to an uncertain amount, for it had to be squared up. Nor was there any present application of the cash received by claimant on the debt. Claimant replied, "All right, John, we will apply this

on it," meaning on the note to be given when the debt was squared up.

Both witnesses testified that the deceased said he would *give* claimant the $7. He did not say he would pay the amount on any debt.

Our court has held that when the statute of limitations has run on a debt, the debt has ceased to exist. Thereafter the only countenance given the debt is to hold that there remains a moral obligation sufficient to constitute a consideration for a new promise to pay. *Sprecher v. Wakeley,* 11 Wis. 432; *Eingartner v. Illinois Steel Co.* 103 Wis. 373, 79 N. W. 433. Necessarily the debt, once barred, to be renewed must be accompanied with all the elements of a new obligation except the consideration. There must be an express acknowledgment of a certain debt with the intention to renew it as a legal obligation. The rule is stated in 17 Ruling Case Law, p. 923, as follows:

"A promise to pay cannot be inferred from the mere fact of payment of part of a debt, there being nothing to raise a presumption that it was a payment on account thereof. The principle on which part payment takes a case out of the statute is that the party paying intended by it to acknowledge and admit the greater debt to be due. If it was not in the mind of the debtor to do this, then the statute, having begun to run, will not be stopped by reason of such payment. Therefore a partial payment, in order to operate as a new promise so as to avoid the bar of the statute, must be made under such circumstances as to warrant the clear inference that the debtor recognizes the debt as an existing liability, and indicates his willingness or at least an obligation to pay the balance."

If the debt has ceased to exist, the rule cannot well be otherwise. 37 Corp. Jur. p. 1099 *et seq.* Where the debt is thirty-four years old and it does not appear that the claimant had ever made any claim against the debtor during that long time, until after the death of the debtor, the rule should not be relaxed.

618

We conclude that the evidence as to a payment on an existing debt, with intent to recognize it as a valid obligation, is too indefinite and unsatisfactory to justify this court in reversing the finding of the county court.

This disposition of the case makes unnecessary any discussion of the appellant's claim of error in rulings on evidence.

*By the Court.*—The order of the county court is affirmed.

ESCHWEILER, J., dissents.